TODD A. PICKLES (SBN 215629)
picklest@gtlaw.com
ROBERT CHARROW (SBN 44962)
charrowr@gtlaw.com
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA 95814
Tel: 916.442.1111
Fax: 916.448.1709

MICHAEL R. SKLAIRE (*pro hac vice* to be filed)
sklairem@gtlaw.com
AARON M. LEVIN (*pro hac vice* to be filed)
levinaa@gtlaw.com
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard Suite 1000
McLean, Virginia 22102
Telephone:  703.749.1300
Facsimile:  703.749.1301

[See signature page for additional counsel]

Counsel for Plaintiff, Behring Regional Center LLC

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BEHRING REGIONAL CENTER LLC,** | CASE NO. |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **ALEJANDRO MAYORKAS**, in his official capacity as Secretary of the Department of Homeland Security, | |
| **UR M. JADDOU**, in her official capacity as Director of the United States Citizenship & Immigration Services, | |
| **ANTONY J. BLINKEN**, in his official capacity as Secretary of the U.S. Department of State, and | |
| **RENA BITTER**, in her official capacity as Assistant Secretary of State, U.S. Department of State, | |
| Defendants. | |

**INJUNCTIVE RELIEF SOUGHT**

1. Plaintiff Behring Regional Center LLC, formerly known as Berkeley Regional Center Fund, LLC, ("**BRC**") established under the laws of the State of California in 2013, a United States Citizen & Immigration Services ("**USCIS**")-designated regional center, seeks declaratory and injunctive relief against Defendants, the Secretary of the U.S. Department of Homeland Security ("**DHS**") Alejandro Mayorkas, Ur M. Jaddou, the Director of USCIS, Antony J. Blinken, the Secretary of the U.S. Department of State, and Rena Bitter, the Assistant Secretary of the Bureau of Consular Affairs at the U.S. Department of State, each in their official capacities (collectively "**Defendants**") based on the following allegations.

**INTRODUCTION AND BACKGROUND**

2. At issue in this case is whether the USCIS, a federal agency within the Department of Homeland Security, may unilaterally, in violation of the plain meaning of a statute, sunset a congressionally mandated investment program. The program at issue requires USCIS, in coordination with the U.S. Department of State, to issue visas to foreign national investors, which in turn revitalizes areas with high unemployment through regional centers authorized by DHS. This Complaint seeks declaratory and injunctive relief for the Agency's unilateral action which is inconsistent with DHS's governing legislation.

3. Originally created in 1990, the EB-5 Immigrant Investor Program ("**EB-5**", the "**Program**", or the "**EB-5 Program**") is an effective and essential program that provides an opportunity for foreign investors who invest $1 million, or $500,000 in certain high unemployment or rural areas, in a business that created ten jobs, to be eligible to become a permanent resident.

4. In 1992, Congress amended the Program in two significant ways to increase the usage, improve efficiency, and ultimately expedite job creation. First, in Section 610(a) of the 1992 Appropriations Act (the "**Act**"), it mandated a special EB-5 pilot program ("**Pilot Program**" or "**Regional Center Program**") operating through regional centers where EB-5 applicants could pool their investment into larger USCIS pre-approved investments, benefit from stronger economies of scale, and simpler job creation reporting requirements utilizing verified econometric methodologies and more. Second, Section 610(b) of the Act initially set aside 300 visas for the Pilot Program (which

through amendment has been increased to 3,000 per annum) to attract sponsors and accelerate the adoption of the newly created Pilot Program. While the visa set-aside in subsection (b) was initially authorized for only five years, the Pilot Program described as a whole in subsection (a) had no time limit.

5. The 1992 Pilot Program grew exponentially given its simpler format and access to institutional quality sponsors and investments, particularly after developers had difficulty obtaining bank loans in the wake of the 2008 financial crisis, the Program proliferated in use by large scale construction projects. Foreign investment through the regional centers' pooled investment offerings allowed large-scale construction projects to continue despite the recession, which led to substantial job creation and economic development in a very difficult economic environment. The Pilot Program was successful.

6. The 1992 Pilot Program worked nearly the same as the original EB-5 Program. Like the original Program, foreign investors who invested $1 million, or $500,000 in certain high unemployment or rural areas, through a regional center sponsored business that created ten jobs, could be eligible for a visa.

7. The Pilot Program became so successful that in 2012, Congress struck the word "pilot" from Section 610 altogether, removing any doubt as to the Program's permanence. In practice, the regional centers that developed nationwide in response to the Act operated without the visa set-aside in subsection (b). Prior to the Pilot Program, Congress set aside 140,000 so-called employment-based visas, 10,000 of which were specifically designated for the EB-5 Program as a whole. Given the success of the Regional Center Program, the special set-aside incentive for the Regional Center Program simply became unnecessary

8. Nonetheless, every few years Congress extended the visa set-aside provision for the Regional Center Program. Each of the numerous extensions affected only Section 610(b), the subsection that dealt specifically with special visa set-asides for the Regional Center Program. No extension was necessary for Section 610(a), which created the Regional Center Program, as that subsection had no time limit, and the Program could and had operated independently from the subsection (b) set-asides.

9. On December 27, 2020, the President signed into law the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 2148 (Dec. 27, 2020), which at section 104, extended Section 610(b) to June 30, 2021 ("Section 610(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993 (8 U.S.C. 1153 note) shall be applied by substituting 'June 30, 2021' for 'September 30, 2015'."). Again, no extension was necessary for Section 610(a), which created the Regional Center Program, as that subsection had no time limit and operates independently of Section 610(b).

10. Thereafter, Congress failed to enact any further extensions to the visa set-asides in Section 610(b) and those set-asides expired on their own terms on June 30, 2021. Congress did not preclude the Regional Center Program in Section 610(a) from continuing.

11. Based on its investments, Plaintiff qualifies for classification or has already been classified as a regional center under the Immigration and Nationality Act, as amended, for purposes of obtaining investments from qualifying individuals seeking conditional permanent resident status in the United States.

12. USCIS relies upon the Department of State's determination regarding whether visa numbers are available for USCIS's use in adjudicating visa applications. While DHS governs the EB-5 Program, the Department of State works in coordination to ensure that visa applications do not exceed the authorized number of visas available. *See* 22 C.F.R. § 42.51(a)–(b). Congress permitted USCIS to give priority to the processing of petitions filed under the Regional Center Program. *See* Public Law No. 108-156, § 4(a)(2) (Dec. 3, 2003) ("immigrant visas made available under such section 203(b)(5) may be issued to such aliens in an order that takes into account any priority accorded" to the processing of petitions filed under the Regional Center Program).

13. Nonetheless, in a web posting, USCIS announced as follows:

> Statutory authorization for the EB-5 Immigrant Investor Regional Center Program ended at midnight on June 30, 2021. This sunset in authorization does not affect EB-5 petitions filed by investors who are not seeking a visa under the Regional Center Program. Due to the sunset in authorization for the Regional Center Program, we will reject the following forms received on or after July 1, 2021.

*Approved EB-5 Immigrant Investor Regional Centers*, USCIS.gov, https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-

immigrant-investor-regional-centers/approved-eb-5-immigrant-investor-regional-centers (last visited Feb. 17, 2022).

14. Irrespective of the expiration of Section 610(b), Section 610(a) and 8 U.S.C. § 1153(b)(5)(A) require Defendants to set aside visas in general, specifically for foreign national investors with petitions based on their investments under the Regional Center Program.

15. Defendants' refusal to issue any new visas for pending or future applications under the Program, as indicated on the USCIS website, is unlawful. It is also an erroneous, and fundamentally flawed exercise of discretion that conflicts with applicable regulations and statutes. *See* Section 610(a) of Public Law No. 102-395.

16. In short, USCIS unilaterally terminated the Regional Center Program, incorrectly believing that it ended on June 30, 2021, despite nothing in the organic legislation sunsetting the authorization for the Regional Center Program. The only thing that Congress ended was the visa set-asides, which was and remains unnecessary for the continued operation of the Regional Center Program.

17. Defendants' dissolution of the Regional Center Program has had a severe adverse economic impact on regional centers and developers like BRC and its affiliates that pool EB-5 investor funds to invest in American businesses through the Program. Defendants have blocked the issuance of new conditional permanent resident status under the Program and precluded the flow of new capital, rendering further investment, through the Regional Center Program, impossible.

18. Defendants' continued refusal to issue immigrant visa numbers and failure to apply the law governing the Regional Center Program is improper because: (i) the clear language in the authorizing statute and more than a score of extension acts state that sunsetting only applied to subsection (b) and not to the Regional Center Program itself (*i.e.*, subsection (a), *see* Public Law No. 102-395, Title VI § 610(a) (Oct. 6, 1992); *see also* 8 U.S.C. § 1153, Statutory Notes - Immigration Program) and (ii) Defendants' improper actions have caused severe economic harm on the Program's users, including Plaintiff, and the United States generally.

19. Plaintiff is prevented from processing and obtaining new qualifying investments under the Regional Center Program, and has suffered harm as a result of Defendants' improper action.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction over all civil suits arising under the Constitution, the laws of the United States, 28 U.S.C. § 2201 (authorizing declaratory relief), and 5 U.S.C. § 701 *et seq*. (judicial review provisions of the Administrative Procedure Act). Under the APA, the Court is authorized to compel agency action unlawfully withheld. *See* 5 U.S.C. §§ 555(b), 558(c), 706(1).

21. Venue is proper pursuant to 28 U.S.C. § 1391(e).

## PARTIES

22. Plaintiff BRC is a California Limited Liability Company located in Contra Costa County, California, that sponsors EB-5 investments to fund both BRC-affiliated and third-party projects using funds from EB-5 investors within the Northern District of California.

23. Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security. He is being sued in his official capacity only.

24. Defendant Ur M. Jaddou is the Director of U.S. Citizenship and Immigration Services. She is being sued in her official capacity only.

25. Defendant Antony J. Blinken is the Secretary of the U.S. Department State. He is being sued in his official capacity only.

26. Defendant Rena Bitter is the Assistant Secretary for Consular Affairs of the U.S. Department of State. She is being sued in her official capacity only.

## BACKGROUND OF THE EB-5 VISA PROGRAM

27. In 1990, under the Immigration and Nationality Act ("**INA**"), Congress established the fifth employment-based preference immigrant visa category for qualified foreign investors. *See* INA § 203(b)(5); 8 U.S.C. § 1153(b)(5). This EB-5 visa category allows foreign entrepreneurs, and their family members, an opportunity to invest in U.S. communities that are economically disadvantaged in exchange for lawful permanent residence ("**LPR**") in the United States. Public Law No. 102-395, Title VI § 610(b); *see also* 8 U.S.C. § 1153. Congress sought, through this new category, to stimulate the U.S. economy and generate employment growth. *See* 8 U.S.C. § 1153(b)(5)(A)(ii); 135 Cong. Rec. 101st Cong. S. 7772 (July 12, 1989) (detailing the importance of job creation).

28. The EB-5 Program gained substantial popularity after the 2008 financial crisis when project developers could not obtain traditional bank loans and sought out other sources of funding. In the last decade, the Program received recognition among foreign entrepreneurs as a reliable and expedited path to become a permanent resident, living and working in the United States.

29. To be considered for permanent residency, a foreign investor was initially required to invest at least $1 million in a new[1] commercial enterprise in the United States that would create at least ten full-time jobs for United States citizens or legal aliens. *See* 8 U.S.C. § 1153(b)(5). The INA also provides a reduced investment threshold for depressed areas of the country, stating that "in the case of investment made in a targeted employment area, [the Secretary of Homeland Security may] specify an amount of capital required . . . that is less than (but not less than 1/2 of) the [standard investment amount] . . . ." of $1 million.  8 U.S.C. § 1153(b)(5)(C)(ii).  These areas are known as "targeted employment areas" or TEAs.  The statute defined TEA to be "a rural area or an area which has experienced high unemployment (of at least 150 percent of the national average rate)," and it defines "rural area" to be "any area other than an area within a metropolitan statistical area or within the outer boundary of any city or town having a population of 20,000 or more (based on the most recent decennial census of the United States)." *See* 56 Fed. Reg. 60897 (1991) at 8 C.F.R. § 204.6(e); 8 U.S.C. § 1153(b)(5)(B).

30. Congress first enacted the Regional Center Program in 1992, to increase the efficacy of the program, attract high-quality sponsored investments and provide an additional avenue for foreign national investors to obtain an EB-5 visa. *See* Pub. L. 102-395 § 610(a) (Oct. 6, 1992) (codified at 8 U.S.C §1153). These visas are issued in coordination with the Department of State, which serves to audit the number of issued immigrant visas.  *See* 8 U.S.C. §§ 1201(a)(1), 1202(a); 22 C.F.R. §§ 41.61(a), 42.32(e)(1), 42.41.  This allowed foreign nationals to invest through regional centers, and soon became the primary vehicle preferred by the vast majority of EB-5 investors.  The issuance of lawful permanent resident status must still comply with other requirements, such as presenting a valid

---

[1] For purposes of this program, "new" refers to commercial enterprises either established after November 29, 1990 or on or before Nov. 29, 1990, if the existing business was restructured to bring about a new commercial enterprise or the existing business was expanded through the investment, resulting in at least a 40% increase in the net worth or number of employees. § 204.6(h)(3).

immigrant visa to immigrant officials at a port of entry. *See* 8 U.S.C. §§ 1182(a)(7)(A)(I), 1225(a)(3). Prior to June 30, 2021, the Regional Center Program accounted for nearly 95% of EB-5 investments.

31. The Regional Center Program is distinguishable from the direct EB-5 Program. The Regional Center Program allows for "indirect job creation" in addition to direct job creation and does not require foreign investor involvement in the day-to-day management of commercial entities.

32. The term regional center refers to an entity (often a limited partnership or a limited liability corporation) where investments from multiple foreign nationals and non-EB-5 investors (e.g., U.S. citizens) can be pooled to fund a broad range of projects, structured through various models (lending, equity, direct investment, etc.). Each year, regional centers must apply for re-certification by USCIS and provide evidence of promoting economic growth to remain eligible for the EB-5 program. 8 C.F.R. § 204.6(m)(6) (failing to submit the required information to USCIS can result in the termination of a regional center). The majority of investment spending and job creation were spurred by regional centers.

33. Investments may be both within a regional center and a TEA. Although a regional center does not have to be in a TEA, almost all foreign nationals applying for EB-5 status invest with regional centers whose defined boundaries constitute a TEA. 8 C.F.R. §204.6(m)(3).

*Extensions To § 610(B) As Opposed To §610(A)*

34. The organic authorizing legislation, enacted on October 6, 1992, as part of Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1993, Pub. L. No. 102-395, 8 U.S.C. § 1153, contained the following key subsections:

> SEC. 610. PILOT IMMIGRATION PROGRAM.—(a) Of the visas otherwise available under section 203(b)(5) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(5)), the Secretary of State, together with the Attorney General, shall set aside visas for a pilot program to implement the provisions of such section. Such pilot program shall involve a regional center in the United States for the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.
>
> (b) For purposes of the pilot program established in subsection (a), beginning on October 1, 1992, but no later than October 1, 1993, the Secretary of State, together with the Attorney General, shall set aside <u>300 visas annually for five years</u> to include such aliens as are eligible for admission under section 203(b)(5) of the Immigration and Nationality Act and this section, as well as spouses or children which are eligible, under the terms of the Immigration and Nationality Act, to accompany or follow to join such aliens.

Pub. L. No. 102-395, §§ 610(a); (b), 106 Stat. 1828, 1874 (Oct. 6, 1992).

35. Subsection (a) established, as a "pilot program," the involvement of regional centers. Subsection (b) initially set aside 300 visas annually for five years for this pilot program (which through amendment has been increased to 3,000 per annum). Regional centers do not depend on the visa set aside in subsection (b) and can operate without the set aside, which through amendment has been increased to 3,000 per annum. *See* Public Law No. 105-119, Title I § 116(a)(1) (Nov. 26, 1997).

36. Congress granted additional extensions *only* to subsection (b). These extensions were set to terminate on September 30 in the years of 1998, 2000, 2003, 2008, 2012, and 2015. The latest of these extensions occurred on December 27, 2020, when the President signed into law the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 2148 (Dec. 27, 2020). Again, this Act only extended Section 610(b) to June 30, 2021 ("Section 610(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993 (8 U.S.C. 1153 note) shall be applied by substituting 'June 30, 2021' for 'September 30, 2015'.").

37. No extension was necessary for Section 610(a), which created the Regional Center Program, as that subsection had no time limit and had operated independently of Section 610(b). Congress has not amended Section 610(b) to extend 610(b) beyond June 30, 2021. However, Section 610(a) remains in effect.

38. In sum, subsection (a) has had no sunset provision since its establishment. Each of the extension amendments extended only subsection (b). Since subsection (a) creates the Regional Center Program, subsection (b) cannot operate without subsection (a). However, subsection (a) can operate without subsection (b), which only sets aside a certain sum of visas, because it contains its own set-aside provision that is independent of subsection (b)'s set-aside provision and has no sunset provision.

39. Moreover, the Extension Act, established on September 28, 2012, deleted the word "pilot" from subsection (a) and, given this deletion, it also deleted the word as it appeared in subsection (b) when referring to subsection (a). *See* Pub. L. No. 112-176, 126 Stat. 1325 (Sept. 28, 2012). This amendment further confirms that subsection (a) had no expiration but was deemed by Congress to be permanent.

40. While Congress introduced the "EB-5 Reform and Integrity Act of 2021, S.831, 117th Congress (2021–2022), https://www.congress.gov/bill/117th-congress/senate-bill/831/text/is), it has yet to become law. This bill would extend the issuance of visas under § 610(b) to "September 30, 2026" and establish a regional center. Without the enactment of this law, further extensions to the visa set-asides in Section 610(b) would expire on June 30, 2021. Once again, this legislation (and the preceding cycle of other proposed or enacted extensions to 610(b)) does not apply to Section 610(a).

*The USCIS's Unilateral Termination of the Regional Center Program*

41. Defendants unilaterally terminated the Regional Center Program. Evidence of this decision is included in USCIS' post:

> Statutory authorization for the EB-5 Immigrant Investor Regional Center Program ended at midnight on June 30, 2021. This sunset in authorization does not affect EB-5 petitions filed by investors who are not seeking a visa under the Regional Center Program. Due to the sunset in authorization for the Regional Center Program, we will reject the following forms received on or after July 1, 2021:
>
> <u>Form I-924, Application for Regional Center Designation Under the Immigrant Investor Program</u>, except when the application type indicates that it is an amendment to the regional center's name, organizational structure, ownership, or administration;…
>
> Until further notice, we will hold (that is, not act on) any pending petition or application of these form types that is dependent on the lapsed statutory authority and was filed before the end of the statutory authorization. At the end of calendar year 2021, unless there is new legislation for regional centers, we will reevaluate whether to keep this hold in place. If we wrote to you about your petition or application on or before June 30, 2021, you should review our written correspondence and respond by the due date (as applicable). Although we cannot review your response right now, we will keep your response for review if circumstances change.

*Approved EB-5 Immigrant Investor Regional Centers*, USCIS.gov, https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-regional-centers/approved-eb-5-immigrant-investor-regional-centers (last visited Feb. 17, 2022). *See* **Exhibit A**.

42. Defendants effectively terminated the Regional Center Program, upon information and belief, under the incorrect assumption that it ended on June 30, 2021 despite the absence of a provision in the organic legislation designating the expiration of, or sunsetting, the authorization for the Regional

Center Program in Section 610(a). In fact, Congress directs USCIS to give priority to the processing of petitions under the Regional Center Program. *See* Public Law No. 108-156, § 4(a)(2) (Dec. 3, 2003). As the legislative history for the Regional Center Program demonstrates, the only thing that Congress ended was the visa set-asides, which was and remains unnecessary for operation of the Regional Center Program.

43. During the seven months that Defendants have not accepted new applications and petitions under the Regional Center Program, the Defendants' actions have had a severe, adverse economic impact on regional centers and developers like BRC and its affiliates that pool EB-5 investor funds to invest in American businesses through the Program. The Department of State has stopped processing immigrant visa applications for EB-5 Program applicants altogether. In a December 10, 2021 letter from the American Immigration Lawyers Association, it was estimated that over 100,000 Regional Center applicants were in limbo as they awaited for the United States to process their investment applications under the Program. Further, 83,000 EB-5 investors with approved EB-5 petitions are also waiting for a visa interview from overseas, and 12,798 EB-5 Regional Center applications are pending at USCIS. https://www.aila.org/infonet/letter-to-uscis-urging-eb-5-regional-center.

44. Defendants' de-facto cancellation of the Program and legally improper action has precluded the flow of new capital, rendering further investment, through the Program, impossible. Defendants' actions further stifled the promotion of the United States' economic growth that the regional centers facilitate through increased export sales, improved regional productivity, job creation, and investment in domestic capital.

45. Defendants discontinued the Regional Center Program despite (i) the clear language in more than a score of extension acts that sunsetting only applied to subsection (b), as opposed to the entire Regional Center Program (*i.e.*, subsection (a)), and (ii) the severe economic harm that such a sunsetting would have on the 632 approved regional centers, the Program's users, including Plaintiff, and the United States generally.

**EFFECT ON PLAINTIFF AND THE ECONOMY**

46. The unilateral and unjustified cancellation of the Program has had devastating effects on the Program's participants and the ability to raise capital for job-creating development projects.

47. BRC and its affiliated project developers, such as Behring Capital LLC, rely on the Program for investment capital. BRC and its affiliates use EB-5 investor funds as financing for projects in California. BRC, in conjunction with affiliate entities, operates as the General Partner or manager of various dedicated EB-5 investment entities, real estate investments, property developments and new commercial enterprises established for pooling qualified EB-5 capital contributions to be invested in real estate projects.

48. Due to the errant lapse in USCIS and State Department processing, BRC and its affiliates have seen foreign investors abandon the Program and demand capital withdrawal. BRC and its affiliates have kept projects afloat through third-party financing and capital loans from their own principals, as a temporary fix in the expectation that Congress or the Agency will correct this unjustified cancellation of the Program. However, this third-party financing is not sustainable because these third-party sources are a temporary fix and not a permanent funding replacement.

49. In addition to the effects on developers using EB-5 funds, the cancellation of the Program's effects on the U.S. economy is severe. The Program has generated billions of dollars of investment in the U.S. economy in the past decade. In an unconstrained environment, studies have shown that the EB-5 Program creates hundreds of thousands of new jobs annually and can account for roughly 6 percent of all job gains. These economic gains have suffered, if not disappeared completely.

**Count I**

**Defendants' Unilateral Termination of the Regional Center Program Violates the Administrative Procedure Act ("APA") Because This Action is not in Accordance With Law**

**(5 U.S.C. § 706(2)(A))**

50. Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

51. The APA empowers this Court to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

12
COMPLAINT

52. The plain language of the Act distinguishes the establishment of the Regional Center Program in Section 610(a) and the visa set-aside provisions in Section 610(b). The June 2021 expiration of Section 610(b) has no effect on Section 610(a), which has no time limit.

53. Defendants' erroneous dissolution of the Regional Center Program unilaterally ended the Regional Center Program. USCIS nor the State Department are no longer accepting or coordinating the processing of visa applications using regional centers. *See* **Exhibit B** (listing the regional center EB-5 as "unavailable"). Defendants' erroneous decision to end the Regional Center Program has inhibited foreign investment by freezing the State Departments' allocation of available immigrant visas under the Program. (https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin.html).

54. Evidently, in making this pronouncement (**Exhibit A**), Defendants extinguished not only the visa set-aside provision of the Program in subsection (b), which was subject to expiration, but also falsely eliminated the entire Regional Center Program, which, by subsection (a), was not subject to expiration. Defendants incorrectly assume that because the visa set-asides per Section 610(b), expired on their own terms on June 30, 2021, that this somehow precluded the continuance of the Regional Center Program under Section 610(a).

55. Because Defendants will no longer accept EB-5 visa petitions through the Regional Center Program, this constitutes a final agency action subject to judicial review, and that has caused Plaintiff to suffer actual, particularized financial harms.

56. Defendants' elimination of the Regional Center Program is not in accordance with the plain language of the Act and congressional intent surrounding the Regional Center Program.

57. Therefore, Defendants attempt to supersede clear statutory language of the Act by ending the Regional Center Program is in violation of 5 U.S.C. §§ 706(2)(A). Therefore, this unauthorized action, *i.e.*, ending the Regional Center Program, must be vacated and the Regional Center Program must be restored.

**WHEREFORE**, Defendants' improper sunset of the Regional Center Program must be reversed.

**Count II**

**Defendants' Unilateral Termination of the Regional Center Program Violates the APA Because This Action Exceeds Defendants' Statutory Authority**

**(5 U.S.C. §§ 706(2)(C))**

58. Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

59. The APA empowers this Court to "hold unlawful and set aside" agency action that is "in excess of statutory … authority." 5 U.S.C. § 706(2)(C).

60. USCIS's erroneous dissolution of the Regional Center Program unilaterally ended the Regional Center Program. USCIS is no longer accepting visa applications using regional centers. *See* Exhibit B (listing the regional center EB-5 as "unavailable"). USCIS's erroneous decision to end the Regional Center Program has inhibited foreign investment by freezing the ability of co-Defendants Blinken and Bitter from allocating available immigrant visas under the Program. (https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin.html).

61. Evidently, in making this pronouncement, Defendants extinguished not only the visa set-aside provision of the Regional in subsection (b), which was subject to expiration, but also falsely eliminated the entire Regional Center Program, which, by subsection (a), was not subject to expiration. USCIS incorrectly assumes that because the visa set-asides per Section 610(b), expired on their own terms on June 30, 2021, that this somehow precluded the continuance of the Regional Center Program under Section 610(a).

62. Defendants do not have authority to sunset the Regional Center Program, which is contrary to the intent of Congress and the plain meaning of the statute and underlying statutory regime, which consistently allowed for Section 610(a) to exist, irrespective of the continuance of Section 610(b). Therefore, this improper action was not based on a reasonable construction of the statute.

63. Because Defendants will no longer accept EB-5 visa petitions through the Regional Center Program, this constitutes a final agency action subject to judicial review.

64. As a result, Defendants' cancellation of the Regional Center Program was "in excess of statutory. . . authority" in violation of 5 U.S.C. § 706(2)(C). This unauthorized, statutory violation has caused Plaintiff to suffer actual, particularized financial harm. Therefore, this unauthorized action, *i.e.*,

ending the Regional Center Program, must be vacated and the Regional Center Program must be restored.

**WHEREFORE**, Defendants' improper sunset of the Regional Center Program must be reversed.

## Count III

**The Rule Is Violative of the APA Because Canceling the Regional Center Program was Without Observance of Procedure Required by Law**

**(5 U.S.C. § 706(2)(D))**

65. Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

66. The APA empowers this Court to "hold unlawful and set aside" agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

67. USCIS's erroneous dissolution of the Regional Center Program unilaterally ended the Regional Center Program. USCIS is no longer accepting visa applications using regional centers. *See* Exhibit B (listing the regional center EB-5 as "unavailable"). USCIS's erroneous decision to end the Regional Center Program has inhibited foreign investment by freezing the ability of co-Defendants Blinken and Bitter from allocating available immigrant visas under the Program. (https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin.html).

68. Evidently, in making this pronouncement, Defendants extinguished not only the visa set-aside provision of the Regional in subsection (b), which was subject to expiration, but also falsely eliminated the entire Regional Center Program, which, by subsection (a), was not subject to expiration. USCIS incorrectly assumes that because the visa set-asides per Section 610(b), expired on their own terms on June 30, 2021, that this somehow precluded the continuance of the Regional Center Program under Section 610(a).

69. The Agency incorrectly assumed that because the visa set-asides per Section 610(b), expired on their own terms on June 30, 2021, that this somehow precluded the continuance of the Regional Center Program under Section 610(a). USCIS does not have authority to sunset the Regional Center Program and stop taking visa applications through the Regional Center Program, absent

congressional directive. The only way to end the Regional Center Program is through congressional action repealing Section 610(a).

70. Because USCIS will no longer accept EB-5 visa applications through the Regional Center Program, this constitutes a final agency action subject to judicial review.

71. As a result, DHS's cancellation of the Regional Center Program was "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D). This unauthorized, statutory violation has caused Plaintiff to suffer actual, particularized financial harm. Therefore, this unauthorized action, *i.e.*, ending the Regional Center Program, must be vacated and the Regional Center Program must be restored.

**WHEREFORE**, Defendants' improper sunset of the Regional Center Program must be reversed.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing Complaint, Counts I-III, Plaintiff prays that the Court:

1. Enter a declaratory judgment as to Counts I, II, and III that the Agency's action as described above is invalid;

2. Enter an order vacating the Agency action as described above and permanently enjoining Defendants from implementing the unilateral cancellation of the Regional Center Program; and

3. Award such further and additional relief as is just and proper.

Respectfully submitted,

Dated: February 19, 2022       By:  */s/ Todd A. Pickles*
TODD A. PICKLES (SBN 215629)
picklest@gtlaw.com
ROBERT CHARROW (SBN 44962)
charrowr@gtlaw.com
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA 95814
Tel: 916.442.1111
Fax: 916.448.1709

|  |  |
|---|---|
| 1 | MICHAEL R. SKLAIRE (*pro hac vice* to be filed) |
|  | sklairem@gtlaw.com |
| 2 | AARON M. LEVIN (*pro hac vice* to be filed) |
|  | levinaa@gtlaw.com |
| 3 | GREENBERG TRAURIG, LLP |
|  | 1750 Tysons Boulevard, Suite 1000 |
| 4 | McLean, Virginia 22102 |
|  | Telephone:  703.749.1300 |
| 5 | Facsimile:  703.749.1301 |
| 6 | SARAH M. MATHEWS (*pro hac vice* to be filed) |
|  | mathewss@gtlaw.com |
| 7 | GREENBERG TRAURIG, LLP |
|  | 1144 15th Street, Suite 3300 |
| 8 | Denver, Colorado 80202 |
|  | Telephone:  303.572.6500 |
|  | Facsimile:  303.572.6540 |

*Attorneys for Plaintiff*